**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | : | |
| MICHAEL CHIN, et al. | : | |
| | : | |
| v. | : | Civil No. CCB-02-1551 |
| | : | CCB-04-4054 |
| MICHAEL WILHELM | : | |
| | : | |
| | : | |

**MEMORANDUM**

The plaintiffs, Michael Chin and Sweet N Spicy Foods, Inc., filed suit on April 29, 2002

against the City of Baltimore, the Baltimore City Police Department, the United States, and

Michael V. Wilhelm, in his individual and official capacities, alleging, in sum, that a search of

Chin's person, business, and vehicles on May 22, 2001 violated various laws and constitutional

rights.  To be more precise, the complaint in CCB-02-1551 alleged violations of federal civil

rights (count one) and Maryland civil rights (count two), and various common law torts (counts

three through seven: negligence, assault and battery, negligent hiring and training, intentional

infliction of emotional distress, and false imprisonment and arrest).

The court previously granted the motions to dismiss of the City of Baltimore and the

Baltimore City Police Department.[1]  *See Chin v. City of Baltimore,* 241 F. Supp.2d 546 (D.Md.

2003).  The court also found, after discovery, that Wilhelm was a federal employee acting within

the scope of his employment at the time of the incident spawning the litigation, and substituted

the federal government as the sole defendant with respect to counts three, four, six, and seven of

the complaint pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2679 (2003).  *See*

---

[1] They were the only defendants named in count five.

1

*Chin v. Wilhelm,* 291 F.Supp.2d 400 (D.Md. 2003).  The court then dismissed counts three, four, six, and seven without prejudice, finding that the court lacked subject matter jurisdiction because Chin had not exhausted his administrative remedies by presenting his tort claims to the appropriate federal agency for resolution.  *Id.*  The court also granted summary judgment for Wilhelm on those aspects of count one that alleged violations of the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983, 42 U.S.C. § 1988, and 18 U.S.C. § 245.  *Id.* at 5-7.  Wilhelm also was granted summary judgment on count two of the complaint, which alleged violations of Articles 2, 19, 24, and 26 of the Maryland Constitution.  The court denied summary judgment on count one with respect to alleged violations of the Fourth Amendment, however, finding that discovery was needed.  *Id.* at 8.

On December 29, 2004, Chin filed a new complaint against the United States, also suing Michael Wilhelm in both his individual and official capacities, the State of Maryland, and the Baltimore City Police Department.  *See Chin, et al. v. Wilhelm, et al.,* Case No. CCB-04-4054. The complaint in Case No. CCB-04-4054 reiterated the same allegations and counts that Chin first presented in Case No. CCB-02-1551.  In addition, Chin moved to consolidate Case No. CCB-04-4054 with Case No. CCB-02-1551.  The motion was granted on April 5, 2005.

At the outset, the court will identify the claims that currently are pending in these cases. As noted, in *Chin v. City of Baltimore,* 241 F. Supp.2d 546, the court dismissed all claims against the City of Baltimore and the Baltimore City Police Department in Case No. CCB-02-1551.[2]  Chin therefore concedes, as he must, that his claims against these defendants in Case No.

---

[2] The court also will dismiss the claims against the State of Maryland set forth in CCB-04-4054.  The Eleventh Amendment prohibits suits in federal court by private individuals against a state unless the state has consented to suit and/or Congress has lawfully abrogated the states'

CCB- 04-4054 are subject to dismissal as well.  The court, moreover, granted summary judgment

for Wilhelm on those aspects of count one and count two that alleged violations of the Fifth and

Fourteenth Amendments to the U.S. Constitution, §§ 245, 1983, and 1988 of Titles 18 and 42 of

the United States Code, and Articles 2, 19, 24, and 26 of the Maryland Constitution.  *See Chin v.

Wilhelm,* 291 F.Supp.2d 400. Chin, therefore, cannot assert these same claims against Wilhelm

in Case No. CCB 04-4054.  As such, the remaining claims in these consolidated cases are as

follows.  First, in count one of CCB-02-1551, Chin alleges that Wilhelm transgressed the Fourth

Amendment, and seeks to bring a cause of action against Wilhelm in his individual capacity

under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388,

395 (1971).  Second, in counts three, four, six, and seven of CCB-04-4054, Chin seeks a remedy

against the United States under the Federal Tort Claims Act, alleging that Wilhelm, during the

course of his employment, committed various tortious acts.[3]  The Fourth Amendment *Bivens*

claim is subject to trial by jury; the FTCA claims are to be tried by the court.

     Now pending is a motion by Wilhelm and the United States for summary judgment on all

---

Eleventh Amendment immunity.  *See Ballenger v. Owens,* 352 F.3d 842, 844-45 (4th Cir. 2003); *Lewis v. Bd. of Ed.,* 262 F.Supp.2d 608, 612 (D.Md. 2003).  The State of Maryland has not consented to suit in federal court.  Though Maryland has waived its sovereign immunity in the Maryland Tort Claims Act ("MTCA"), it has done so only for actions brought in state courts. Md. St. Gov't Code Ann. § 12-104(a)(1).  Chin's tort claims against the State of Maryland are therefore barred by the Eleventh Amendment.  Moreover, with regard to Chin's § 1983 claims, a state agency is not a "person" as the term is used in 42 U.S.C. § 1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989).  For that reason, the State of Maryland cannot be sued pursuant to § 1983.

[3] Chin's suit under the FTCA now can proceed because he presented his tort claims to the U.S. Drug Enforcement Administration for resolution.  Count three alleges negligence; count four alleges assault and battery; count six alleges intentional infliction of emotional distress; and count seven alleges false imprisonment and arrest.

counts.  The parties have fully briefed the motion and no hearing is necessary.  Local Rule 105.6.

For the reasons stated below, the defendants' motion will be granted in full.

## BACKGROUND

Chin, who was born in Jamaica, is the owner of Sweet N Spicy Foods, a food supply firm

located at 2617 Windsor Avenue in Baltimore, Maryland.  The business is a wholesaler of

specialty foods including food from the Caribbean.  The food is often brought from New York,

frequently by Chin, in company trucks.  The food is then unloaded at the Windsor Avenue

facility and distributed to area retailers.  Prior to May 2001, the business had never had any

difficulties with any government authorities.

Wilhelm has been employed as a police officer with the Baltimore City Police

Department ("BCPD") since 1992. Wilhelm worked in various narcotics divisions of the BCPD

before becoming deputized as a Task Force Officer assigned to the Heroin Task Force of the

Drug Enforcement Administration ("DEA") in December 1999.  On May 22, 2001, Wilhelm's

group received a call from another DEA group, Mass Transportation Interdiction Group

("MTIG"), seeking assistance with the surveillance of two vehicles alleged to be transporting

narcotics and weapons from New York to a business located in Baltimore City.  Def. Mot.

Summ. J., Ex. 1 at 15-17.

According to an anonymous tip, two trucks traveling from Philadelphia and New York

would arrive separately, between 5 p.m. and 6 p.m., at 2617 Windsor Avenue, Baltimore,

Maryland.  The trucks would carry a large quantity of marijuana and guns.  One of the trucks

would be white, with "Sweet and Spicy Foods" and a palm tree logo on the door.  This truck,

which would bear Maryland license tag number 078-E21, would be driven by a Jamaican man.

*Id.,* Ex. 2 at 1, ¶ 5(a).

MTIG asked Wilhelm to monitor the arrival of the described vehicles at Sweet N Spicy Foods.  Wilhelm and another DEA agent set up surveillance within two to three blocks of Sweet N Spicy Foods between 4 p.m. and 5 p.m.  *Id.,* Ex. 1 at 22, 28.  After an hour or less, a white truck, driven by a black man and bearing the license tag number 194-E84, arrived at the loading dock of Sweet N Spicy Foods.  *Id.,* Ex. 1 at 28; Ex. 2 at 2, ¶ 8.  The driver exited the truck and disappeared inside the business establishment.  *Id.*  In response to Wilhelm's call for assistance, members of the Western District of the BCPD secured the perimeter around Sweet N Spicy Foods.  *Id.,* Ex. 2 at 2, ¶¶ 9-11.

A second white truck arrived at Sweet N Spicy Foods approximately 65 minutes later.  This truck was embossed with a palm tree logo and the words "Sweet N Spicy Foods."  The license tag number for this truck was 078-E21.  The driver, a black male wearing a blue hat and a blue jacket, exited the vehicle carrying a gray briefcase and a small duffle bag, neither of which appeared to be holding any weapons. The driver was later identified as Chin.  Chin entered the building through a garage door while a forklift operator began to unload boxes from the truck, which was parked outside the building.  *Id.,* Ex. 1 at 32-35.

At this point, Special Agent Ralph Holliman decided to secure the location.  Ten to fifteen agents appeared on the scene, along with BCPD officers.  The law enforcement officers, who Chin alleges were not wearing DEA embossed jackets or visible law enforcement badges, approached the location with their guns drawn.[4]  Chin was standing in the loading dock.

_____

[4] The government alleges that the agents were wearing DEA embossed jackets and visibly displayed law enforcement badges.  The court, however, must set forth the facts "in the light most favorable to the party asserting the injury," in this case, Chin.  *Saucier v. Katz,* 533

Wilhelm identified himself to Chin; Wilhelm had put his gun away because he did not perceive a threat to his safety.  Wilhelm heard Agent Holliman ask Chin for permission to have a canine search the truck.  Wilhelm did not hear Chin's reply, but did observe the dog and the dog's handler "conducting their cursory search of the truck" that Chin arrived in.  *Id.,* Ex. 1 at 61, 62, 66.  Chin recollected that he was asked if the "place" could be searched and he "assumed" that they meant the business, not the truck.  *Id*., Ex. 4 at 49.  When Chin asked the police if they had a warrant, the police told him "no."  In response, Chin told the officers to get the "fuck out" and then went toward the door and was "grabbed."  *Id.,* Ex. 4 at 50.

Wilhelm then saw the dog "alert to the presence of narcotics inside that vehicle."  *Id.,* Ex. 1 at 66.  After the dog "alerted," thereby indicating that drugs were present in the truck, Chin heard someone say, "he's on to something, there's something in the truck."  *Id.,* Ex. 4 at 52-53.  Chin observed that officers asked one of his employees to unload the truck and started browsing through the warehouse; according to Chin, "they were all over the building."  *Id.,* Ex. 4 at 53-54.  The officers went over to the other section of the building and Chin told them, "I own the other section if you want to go in there" and "gave them the keys."  *Id.,* Ex. 4 at 54.

According to Wilhelm, after the dog "alerted" to the presence of narcotics, he moved closer to hear the conversation between Chin and Agent Holliman and recalled at that point "Mr. Chin became a little irate or a little upset and said that he didn't want the dog searching anywhere else."  *Id.,* Ex. 1 at 68.  In effect, Wilhelm believed that Chin "withdrew his consent"

---

U.S. 194, 201 (2001); *Brown v. Gilmore,* 278 F.3d 362, 269 (4th Cir. 2002) ("[W]e are required to consider whether the facts, taken in the light most favorable [to the injured party], show that [the officer's] conduct violated a constitutional right.").  Thus, I will assume that the agents did not display law enforcement credentials.

for the law enforcement officers to use the dog to search the premises.  *Id.,* Ex. 1 at 82.  Special Agent Holliman informed Chin that an attempt to obtain a search warrant would be made and asked Wilhelm to be the co-affiant on the warrant.  Chin stated that he wanted to leave but was advised that he could not leave until the judge ruled on the request for a search warrant.

Chin then walked past Wilhelm and Holliman and started toward the door.  Wilhelm positioned himself between Chin and the door.  *Id.,* Ex. 1 at 83.  Although Chin had been advised that he could not leave, Chin repeated that he was going to leave anyway.  Chin stated that he was "pissed," and that he was "no angel," and was "raising hell."  *Id.,* Ex. 4 at 51.  According to Chin, as he walked through the door into the loading dock, he was grabbed by Wilhelm and another agent.  Chin alleges that three to four officers took him into the loading dock and slammed him up against a concrete wall.  Wilhelm admits placing his hands on Chin's shoulders and using some degree of "strength" to overcome Chin's resistance as he was trying to exit the building.  *Id.,* Ex. 1 at 88, 90.  He and Agent Holliman "put [Chin] up against the wall."  *Id.*, Ex. 1 at 91.  Chin was then handcuffed by the officers and seated on the floor of the loading dock. Chin asserts that he was in handcuffs for six hours.[5]  Pl.'s Resp., Ex. 1 at 21-22.  Chin further alleges that he complained to law enforcement officers, including Wilhelm, that the handcuffs were too tight, but no one took any steps to alleviate his discomfort.

---

[5] Wilhelm asserts that Chin was only in handcuffs for 15 minutes, and that he removed the handcuffs.  Def. Mot. Summ. J., Ex. 1 at 114. As stated above, however, the court must set forth the facts in the light most favorable to the party asserting the injury, so I will assume that Chin was, in fact, handcuffed for six hours.  It must be noted that Wilhelm was not present during much of this time because he left to obtain a search warrant.

In the meantime, Wilhelm went to obtain a search warrant.[6]  Chin testified that Wilhelm had left "the scene and went to get authorization or whatever, whatever he left the scene for, because there had to be something why they didn't start tearing the goods that they took off the truck at that time."  Def. Mot. Summ. J., Ex. 4 at 56.  Chin went on to state that it "was a while after they started digging in."  *Id.*  Chin explained that "when they started digging in," he heard somebody say, "yeah, they got the go-ahead," and the search of the building commenced.  *Id.,* Ex. 4 at 68.  The officers began to tear through boxes, cans, and other containers looking for narcotics and weapons.  The search took approximately six and one-half hours.  Before the search was complete, Wilhelm returned to the scene and gave Chin an unsigned warrant application.  No signed warrant was ever given to Chin.

No narcotics or weapons were found as a result of the search.  Chin estimates that the food damaged by the officers and contaminated by the dog totaled approximately $4,000.  He also alleges that his hands became swollen due to the extensive time in handcuffs, he needed to see a doctor about his condition, and his arms hurt for "six months."  Pl. Resp., Ex. 1 at 30.  Moreover, Chin missed approximately five days of work when the business closed, which resulted in an additional loss of business profit totaling $10,000.  *Id.,* Ex. 1 at 9.

## ANALYSIS

I.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

---

[6] Prior to the time that Wilhelm sought to obtain a search warrant, he was advised by the BPD's Western District that within the past two weeks the police had made several arrests for the possession of marijuana that had a spicy smell which masked the odor of the marijuana.  Def. Mot. Summ. J., Ex. 2 at 4, ¶ 32.  The individuals arrested indicated that the marijuana was shipped to Baltimore City mixed with fruit or spice to mask the odor against detection.

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

II      Bivens Claim and Qualified Immunity

Chin alleges that his Fourth Amendment rights were violated because Wilhelm lacked probable cause to seize Chin, and Wilhelm used excessive force against him. Further, Chin

alleges that Wilhelm searched the business without a warrant.  While Chin cannot sue Wilhelm in his official capacity, *Chin,* 291 F.Supp.2d at 405, it is well established that a constitutional tort action may lie against a federal officer in his individual capacity.  *Bivens,* 403 U.S. at 395.  Here, however, Wilhelm argues that he did not violate Chin's constitutional rights, and that if he did, he is protected from liability by the doctrine of qualified immunity.

Government officials performing discretionary functions are entitled to immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800 (1982).  When evaluating a claim of qualified immunity, the court first must consider the threshold question of whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right.  *See Saucier,* 533 U.S. at 201 (2001).  If the plaintiff has stated a constitutional violation, then the court must consider whether the right was "clearly established" at the time of the violation.  *See id.*   This second step in the qualified immunity analysis asks "whether it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.  Because qualified immunity is an affirmative defense, Wilhelm must establish that it would not be clear to a reasonable officer that his conduct was unlawful in the situation presented.

A.      Unlawful Arrest

Chin claims that his detention by Wilhelm was tantamount to an arrest and constituted a violation of the Fourth Amendment because Wilhelm lacked probable cause.  "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required."

*Brown v. Gilmore,* 278 F.3d 362, 367 (4th Cir. 2002).  Even if probable cause did not exist,

Wilhelm would be entitled to qualified immunity if it was objectively reasonable for him to

believe that probable cause existed.  *Torchinsky v. Siwinski,* 942 F.2d 257, 260-61 (4th Cir.

1991); *Rowland v. Perry,* 41 F.3d 167, 174 (4th Cir. 1994).

In this case, Wilhelm received information through an anonymous tip that weapons and

narcotics were being delivered to Sweet N Spicy Foods on May 22, 2001.  The tip described the

vehicles and the marking thereon, as well as the driver of one of the vehicles and its license plate

number. Chin makes much of the fact that the anonymous tip was "unverified."[7]  Pl. Resp. 19.

Importantly, however, Wilhelm and his fellow law enforcement officers corroborated the tip

through independent observation. The law is clear that anonymous tips may establish probable

---

[7] Chin also asserts that Wilhelm lied to the Honorable John R. Hargrove, Jr. when he sought a warrant to search Chin's business premises and vehicles, and this misconduct resulted in an illegal search that violated Chin's Fourth Amendment rights.  According to Chin, the Application for Search Warrant signed by Wilhelm states that Wilhelm – one of two affiants – "contacted Sgt. Hergenroeder of the Western District operation Safe Street Unit and relayed the following information.  That they were contacted by a reliable source of information, hereinafter referred to as the CS...."  Def.'s Mot. Supp. Exs., Ex. 6.  In Wilhelm's deposition, however, he stated under oath that he had never spoken to the confidential source.  This argument is unpersuasive for two reasons.  First, as noted, Wilhelm was one of two affiants on the search warrant application.  Thus, the other affiant – not Wilhelm – could have communicated with the confidential source.  Second, Wilhelm's actions are protected by the doctrine of qualified immunity.  When an officer acts pursuant to a warrant, the pertinent question is whether the officer could have reasonably thought there was probable cause to seek the warrant.  *Smith v. Reddy,* 101 F.3d 351, 356 (4th Cir. 1996).  Qualified immunity will not lie only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable.  *Id.*  In this case, I believe that a reasonable officer in Wilhelm's position, despite the omission of the fact that the information was provided by an anonymous rather than a "reliable" tipster, would find probable cause for the search of Chin's premises and trucks.  As described herein, Wilhelm independently verified much of the information provided by the confidential source.  Moreover, the canine sniff of the truck driven by Chin yielded a positive alert for the presence of narcotics.  These factors lead me to conclude that the search was supported by adequate probable cause, even if Wilhelm did, in fact, misrepresent the "reliability" of the source of his information to Judge Hargrove.

cause when they are corroborated by independent police investigation.  *See Illinois v. Gates,* 462 U.S. 213, 238 (1983); *United States v. McCraw,* 920 F.2d 224, 227-28 (4th Cir. 1990).  Here, Wilhelm verified a substantial portion of the information provided by the tipster.  For example, Wilhelm independently observed trucks matching the distinctive description provided by the tipster, arriving separately, as predicted by the tipster, at the location and within the timeframe predicted by the tipster.  Moreover, the canine sniff of the truck driven by Chin yielded a positive alert for the presence of narcotics.  The courts have recognized that when a dog alerts positive for the presence of drugs, probable cause is established.  *See United States v. Jeffus,* 22 F.3d 554, 557 (4th Cir. 1994).[8]

The Supreme Court has  held that where law enforcement officers have probable cause to search property, they may temporarily detain or control individuals associated with that property. *See Michigan v. Summers,* 452 U.S. 692, 702-05 (1981) (law enforcement officers have authority to temporarily detain individuals on premises while valid search is being conducted); *United States v. Programmetric Data Svcs., Inc.* 259 F.3d 229, 239 (4th Cir. 2001) (detention and interview of employees while company was being searched did not exceed scope of search warrant or otherwise violate the Fourth Amendment).  According to the Supreme Court, such detentions further three law enforcement interests: (1) preventing flight of the individual if incriminating evidence is found; (2) minimizing the risk of harm to the police; and (3) facilitating orderly completion of the search.  *Id.* at 702-03.  Chin, the driver of the truck to

---

[8] Chin asserts that he denied consent for the dog sniff.  There is no evidence, however, that Wilhelm was aware of this alleged denial.  While he could not hear Chin's response to Agent Holliman's request, he saw that the dog and its handler immediately thereafter entered the truck, leading to the reasonable conclusion, reflected in the affidavit, that Chin consented to the entry of the truck for the canine sniff.

which the dog alerted, was actively trying to leave the premises, so preventing his departure furthered the first interest.  Further, Chin admits he was "no angel," and was "raising hell."  Def. Mot. Summ. J., Ex. 4 at 51.  It was clear to Wilhelm that Chin planned to interfere with the investigation.  Thus, detaining Chin was necessary for the orderly completion of the search.

In this case, of course, Chin's detention, by way of handcuffs, occurred before the police obtained a warrant to search the premises.  However, the principle articulated in *Summers* has been extended to those situations where, as here, the police detain individuals while they seek a warrant to search the premises.  *See, e.g., Illinois v. McArthur,* 531 U.S. 326 (2001) (police can prevent a suspect from entering his home for approximately two hours while waiting for a search warrant); *United States v. Cephas,* 254 F.3d 488 (4th Cir. 2001) (police officer can prevent individuals from leaving apartment for approximately 90 minutes while waiting for a search warrant).  Thus, even if the detention was lengthy, Wilhelm did not violate a clearly established constitutional principle when he detained Chin.

B.      Excessive Force

Chin next alleges that Wilhelm used excessive force to restrain him.  The Supreme Court has held that claims against law enforcement officers for the alleged use of excessive force during an arrest, investigatory stop, or other seizure should be analyzed under the Fourth Amendment's objective reasonableness standard.  *Graham v. Connor,* 490 U.S. 386, 395 (1989).  With regard to an excessive force claim, the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396.  Moreover, the

reasonableness of the force used is assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Wilson v. Flynn,* 429 F.3d 465, 468 (4th Cir. 2005).  Indeed, "the reasonableness of the officer's actions in creating the dangerous situation is not relevant to the Fourth Amendment analysis; rather, reasonableness is determined based on the information possessed by the officer at the moment that force is employed." *Waterman v. Batton,* 393 F.3d 471, 477 (4th Cir. 2005).

Chin has failed to demonstrate that Wilhelm's response was objectively unreasonable. Here, the crime suspected was not minor in nature.  To the contrary, Wilhelm had reason to believe that the truck driven by Chin to Sweet N Spicy Foods contained narcotics and possibly firearms, serious offenses.  Indeed, while Chin's behavior toward the law enforcement officers probably was not overtly threatening, the possible presence of firearms in his business premises clearly posed a threat to the officers' safety.  Chin, moreover, actively resisted Wilhelm's attempts to prevent him from leaving the premises.  Though Wilhelm told Chin that he could not leave Sweet N Spicy Foods until a judge ruled on the warrant application, Chin nonetheless tried to leave.  Chin admitted that he was "raising hell," Def. Mot. Summ J., Ex. 4 at 51, forcing law enforcement officers to place him in handcuffs.  Importantly, Chin concedes that after he was handcuffed, no further physical touching of his person occurred.  Def. Mot. Summ. J., Ex. 4 at 72. *See Wilson,* 429 F.3d 465 (no excessive force violation where police stopped using force after handcuffs were placed on plaintiff).  Chin relies on the fact that Wilhelm pushed him up against a wall in the process of handcuffing him.  The Supreme Court's Fourth Amendment jurisprudence, however, "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof

to effect it." *Graham,* 490 U.S. at 396.  In sum, the facts support a finding that the force used to handcuff Chin was that force necessary to control an aggressive individual in volatile circumstances.  Accordingly, I do not find a violation of Chin's constitutional rights; if there was, Wilhelm would be entitled to qualified immunity.

C.      Warrantless Search

Chin contends that the search of Sweet N Spicy Foods was undertaken without a warrant.  Pl. Resp. 9.  Chin's own deposition undermines this assertion, however.  To be more precise, Chin admitted that Wilhelm left to get "authorization." Def. Mot. Summ J., Ex. 4 at 56.  Chin stated that he was seated on the floor of the loading dock in handcuffs by an officer who was not Wilhelm.  Chin testified that Wilhelm had left "the scene and went to get authorization or whatever, whatever he left the scene for, because there had to be something why they didn't start tearing the goods that they took off the truck at that time." *Id.,* Ex. 4 at 56.  Chin went on to state that it "was a while after they started digging in." *Id.*  Chin explained that "when they started digging in," he heard somebody say, "yeah, they got the go-ahead," and the search of the building commenced. *Id.,* Ex. 4 at 68.  Only then did the officers begin to search through boxes, cans, and other containers looking for narcotics and weapons.  Wilhelm also gave Chin what appeared to be an unsigned application for a warrant.  *Id.*, Ex. 4 at 72.  Though Chin was not provided with the original of the signed warrant,[9] Chin's own testimony supports the conclusion

---

[9] Chin asserts that the failure to return the warrant should preclude summary judgment in this case.  The failure to return a search warrant, however, does not invalidate the warrant or the acts taken under the authority of the warrant.  The return of the warrant is a ministerial act. *Mills v. State,* 279 A.2d 473, 479-80 (Md. Ct. Spec. App. 1971); *Aiken v. State,* 647 A.2d 1229, 1236 (Md. Ct. Spec. App. 1994).  Even under Rule 41 of the Federal Rules of Criminal Procedure, which governs federal search warrants, ministerial violations of the rule do not necessarily establish a constitutional violation; rather, the plaintiff must show that he was prejudiced by the

that no warrantless search was conducted and Chin's constitutional rights were not violated.[10]

III.    Federal Tort Claims Act

Counts three, four, six, and seven of Chin's complaint in Case No. CCB 04-4054 allege various torts, namely, negligence, (count three), assault and battery (count four), intentional infliction of emotional distress (count six), and false arrest and imprisonment (count seven). These counts warrant dismissal for failure to state a claim upon which relief can be granted.

The United States is liable under the FTCA only to the limited extent that it has waived sovereign immunity.  *See* 28 U.S.C. §§ 1346(b), 2674; *see also Curtis v. Pracht, PFC,* 202 F.Supp.2d 406, 417 (D.Md. 2002).  Further, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and is entitled to all defense available to its agents.  *Norton v. United States,* 581 F.2d 390, 393 (4th Cir. 1978).

Chin's tort claims, for which sovereign immunity is waived pursuant to the FTCA, are governed by the law of Maryland, where the alleged tortious acts occurred.  *See* 28 U.S.C. §§ 1346(b); 2674.  Under Maryland statutory law, individual state government employees are immunized from tort liability for acts or omissions committed within the scope of their

---

violation.  *United States v. Wyder,* 674 F.2d 224, 226 (4th Cir. 1982) (cert. denied sub nom. *Mallory v. United States,* 457 U.S. 1125 (1982)); *see also United States v. Smith,* 914 F.2d 565, 568 (4th Cir. 1990).  Because there was substantial probable cause for the search of Chin's premises, Chin cannot make this showing.

[10] The government provided the court a signed declaration from Judge Hargrove, a Maryland state court judge, explaining that he did sign the warrant for the search of Chin's business premises and his vehicles.  Chin asserts that Judge Hargrove should be forced to testify about the circumstances of his affidavit.  I do not believe that such testimony would aid the development of any relevant facts in this case. Accordingly, I will grant the State of Maryland's motion to quash the subpoena that Chin served on Judge Hargrove.

employment and made without actual malice or gross negligence.  *See* Md. Code Ann., Cts. &

Jud. Proc. § 5-522(b).  Likewise, Maryland statutory law also immunizes local government

employees from the execution of monetary judgments for tort claims based on acts or omissions

committed within the scope of their employment and made without actual malice. *See* Md. Code

Ann., Cts. & Jud. Proc. § 5-302(b).  Thus, "a law enforcement officer is not liable for assault and

battery or other tortious conduct performed during the course of his official duties unless he

acted with actual malice toward the plaintiff, i.e., with 'ill will, improper motivation or evil

purpose.'"  *Goehring v. United States,* 870 F.Supp. 106, 108 (D.Md. 1994) (quoting *Davis v.*

*Muse,* 441 A.2d 1089, 1093 (1982)).

 "Malice is established by proof that the defendant-officer 'intentionally performed an act

without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the

purpose being to deliberately and wilfully injure the plaintiff.'" *Lovelace v. Anderson,* 730 A.2d

774, 788 (1999) (quoting *Davis v. DiPino,* 637 A.2d 475 (1994) (rev'd on other grounds, 655

A.2d 401 (1995)); *see also Lee v. Cline,* 863 A.2d 297, (Md. 2004) (quoting *Shoemaker v. Smith,*

725 A.2d 549, 559 (Md. 1999)) ("'Actual malice,' in Maryland law, normally refers 'to conduct

characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing,

ill-will or fraud....'"). "The mere assertion that an act 'was done maliciously, or without just

cause, or illegally, or without wanton disregard, or recklessly, or for improper motive' is not

sufficient." *Manders v. Brown,* 643 A.2d 931, 943 (1994) (quoting *Elliott v. Kupferman,* 473

A.2d 960 (1984)).  Plaintiffs "must allege with some clarity and precision those facts which

make the act malicious." *Id.*

 Chin has not shown that Wilhelm acted with actual malice.  To the contrary, Wilhelm

acted on the reasonable belief that he had probable cause to search Sweet N Spicy Foods and detain Chin. Wilhelm also used a reasonable degree of force – and not excessive force – when he restrained Chin and prevented him from leaving the premises.  Indeed, Wilhelm's motivation was to prevent the disruption of the search and to detain a suspected criminal, not ill will. Accordingly, Wilhelm is entitled to summary judgment on counts three, four, six, and seven.

With regard to count six – intentional infliction of emotional distress – Chin also has failed to show facts sufficient to support a claim under Maryland law.  To state a claim for intentional infliction of emotional distress, a plaintiff must establish that: (1) Wilhelm's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the intentional conduct caused emotional distress; and (4) the emotional distress was severe.  *Harris v. Jones,* 380 A.2d 611 (1977).  For conduct to be "extreme and outrageous," it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 613 (quoting Restatement (Second) of Torts § 46, comment (d) (1965)).  The search and detention described above do not rise to the level of being extreme or outrageous.

Chin's claim of intentional infliction of emotional distress fails for an additional reason. Under Maryland law, "an intentional infliction of emotional distress plaintiff must show the 'truly devastating effect' of the conduct they were subjected to by proving an emotional response 'so acute that no reasonable person could be expected to endure it.'"  *Rich v. United States,* 158 F.Supp.2d 619, 630 (D.Md. 2001) (quoting *Pemberton v. Bethlehem Steel Corp.,* 502 A.2d 1101, 1115 (1986)).  A plaintiff, moreover, must plead specific facts regarding the nature, intensity, and duration of the alleged emotional trauma. *Manikhi v. Mass Transit Admin.,* 758 A.2d 95,

113 (Md. 2000).  Chin only has provided an unsubstantiated allegation that he was subject to a situation that was "designed to be emotionally stressful to anyone on the premises," Pl. Resp. 23, and that it left him feeling "humiliated."  Pl. Resp., Ex. 1 at 35.  Chin makes no specific factual allegations as to the nature, intensity, and duration of the alleged emotional trauma, much less a severely disabling emotional trauma. Therefore, Chin's allegations are insufficient to sustain a claim for intentional infliction of emotional distress against Wilhelm.

A separate order follows.


   March 24, 2006                              /s/
          Date                          Catherine C. Blake
                                        United States District Judge

19